# 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

## Commonwealth v. W. R. Clarke.

### January 17, 1924.

#### Absent, Sims and Burks, JJ.

TAXATION—*Amusement Park—Carnivals—Case at Bar.*—The owner of a city lot had for fifteen years prior to the year 1921 leased the lot as a show ground to carnivals and circuses. In 1921 the owner took out a license under section 111½ of the tax bill for the operation on the lot of a "permanent park for public amusement." There were no permanent improvements on the lot, and the only pretense of a permanent or continuous public amusement on the premises was a "Baby Rack" placed thereon by the proprietor of a carnival a week in advance of the first performance of the carnival on the lot. The proprietor of this carnival contracted with the owner of the lot to exhibit upon the lot, the owner of the lot to have forty per cent and the proprietor of the carnival sixty per cent of the gross receipts; but if the owner's forty per cent exceeded $750.00, such excess should be paid to the proprietor of the carnival.

 *Held:* In substance, that the owner of the lot and the proprietor of the carnival occupied the relationship of landlord and tenant; that the owner of the lot was not operating a permanent park for public amusement, and his license did not authorize the exhibition of the carnival upon which a carnival license tax was assessable under sections 107, 108 and 109 of the tax bill.

Error to a judgment of the Corporation Court of the city of Danville, in a proceeding to correct an erroneous assessment. Judgment for plaintiff. Commonwealth assigns error.

*Reversed.*

The opinion states the case.

*J. Vaughan Gary* and *E. Warren Wall,* for the Commonwealth.

*H. T. Williams* and *Henry C. Leigh*, for the defendant in error.

Kelly, P., delivered the opinion of the court.

H. C. Ficklen, a resident of the city of Danville, is and for some years has been the owner of a large and valuable lot fronting on west Main street, in that city. For some fifteen years prior to the year 1921, he had from time to time leased this lot as a show ground to persons desiring to exhibit a circus or operate a carnival thereon, such persons obtaining and paying for their own licenses. In the year 1921, however, Mr. Ficklen obtained from the commissioner of the revenue for that city, a license in his own name, under the provisions of section 111½ of the tax bill for the operation on the lot aforesaid of a "permanent park for public amusement," for which he paid the prescribed tax of $400.00. Shortly thereafter he entered into a written contract with W. R. Clarke, manager of Billy Clarke's Broadway Shows, whereby the latter obligated himself to exhibit a carnival on the lot for six consecutive days, beginning April 11th and ending April 16th. The contract provided, among other things, that Ficklen should pay to Clarke, as compensation for the several performances, sixty per cent of the gross receipts arising therefrom; that out of the sum thus paid him Clarke should pay all the operating expenses of the carnival; that Ficklen should receive no rent for the use of the park, and should furnish the necessary city and State licenses; that if forty per cent of the gross receipts from the carnival exceeded $750.00, such excess should be paid to Clarke; that Clarke must deposit $750.00 with Ficklen to guarantee the six daily performances, which sum was to be retained by Ficklen as liquidated damages, in case

of a total or partial breach of the contract; that if any State license other than that already held by Ficklen should be required, it should be paid in the proportion of four-ninths by Ficklen and five-ninths by Clarke, and that any and all additional city licenses against either Ficklen or Clarke should be paid by Clarke.

When the performance began on the lot, the commissioner of the revenue, acting under instructions from the State Auditor, assessed a carnival license tax against Clarke, pursuant to the provisions of sections 107, 108 and 109 of the tax bill, and such license for each of the six performances, aggregating $900.00, was paid by Clarke.    This payment was made under protest and Clarke thereafter applied to the corporation court of the city of Danville for a correction of the assessment and a return of the tax so paid thereunder.    The relief was granted, and the Commonwealth assigns error, contending, first, that Ficklen was not operating a permanent park for public amusement within the meaning and intent of section $111\frac{1}{2}$ of the tax bill, and, second, that Clarke, and not Ficklen, was the real operator of the carnival, and that Ficklen was in substance and effect, merely the lessor of the grounds upon which the carnival was operated.

Section $111\frac{1}{2}$ of the Virginia tax laws, as in force in the year 1921, provided "that all owners and operators of permanent parks for public amusement, which shall be open for the public at least three months during each year, shall have the option of being exempted from the payment of licenses provided in sections    *   *   *   one hundred and seven, one hundred and nine    *.   *    *"  of the Virginia tax laws, "and in lieu thereof upon the payment of a special license tax of four hundred dollars for a period of four months    *   *    shall have the privilege of doing any or all of the things set out in the

above sections  *  *  one hundred and seven, one
hundred and nine   *   *   and shall be exempted from
the payment of the license taxes provided in said sec-
tions."

Sections 107 and 109 mentioned in the foregoing
quotation, imposed a specific license tax upon circuses,
carnivals and similar performances at a much higher
rate than the tax on a permanent park for public
amusement.

The lot on which the exhibitions were given by
Clarke, and on which the alleged "permanent park for
public amusement" was located was vacant and un-
improved, and in no way resembled such a park.  It was
simply, as it has been for many previous years, an exhi-
bition ground for transient shows with no permanent
features.   The only pretense of a permanent or con-
tinuous public amusement on the premises was a "Baby
Rack" placed thereon by Clarke at the special request
of Ficklen, a week in advance of the first performance
by Clarke, and removed as soon as the last performance
was ended.   Ficklen testified in part on this subject as
follows:

"Q. State whether or not you have any intention at
any time in the near future of using this ground for any
other purpose than such as you have been using it for?

"A. My intention for years has been ultimately to
have an improved park with physical devices for amuse-
ment, not only such as it is used for at present and for
the past several years but for traveling shows as well,
as there is sufficient ground for both.

*      *      *      *      *      *

"Q. Were there any amusements on this property
prior to the time the Billie Clarke's Broadway Shows
exhibited there?

"A. The Auditor in letters and telegrams had first

insisted on the permanency of the amusement rather than the permanency of the purpose of the park, and to meet what I thought was an absurd contention on the part of the Auditor, and there had been no court decision in any case on this subject at that time, I had a merely nominal small amusement called, I believe, a baby rack, which was open for business to fill an interval between Clarke's show and the preceding one (known as the Smith Carnival.)

"Q. What was the duration of the interval, Mr. Ficklen?

"A. I am not sure that the whole interval had to be filled on the theory, but the baby rack affair was there for a week as the license issued for the city will show.

"Q. You have not answered the question, Mr. Ficklen?

"A. Smith closed April 2nd, Clarke began April 11th.

"Q. Did the baby rack operate during that entire period?

"A. I think so.

"Q. By what agreement or an arrangement was the baby rack operated, Mr Ficklen?

"A. It was a part of an understanding which I had on my contract with Clarke. I did not wish my license to lapse, if what I considered an absurd contention was maintained, and as I had an engagement with Clarke, I wished to protect this and so did he.

"Q. Then Mr. Clarke sent one of his amusements from his show to Danville a week preceding his regular show which exhibited on your ground, is that true?

"A. I made a contract with Mr. Clarke, revising the whole contract myself, to that effect.

"Q. And under the agreement of this contract, Mr. Clarke sent the baby rack in advance of his regular show?

"A. He kept his contract; yes.

"Q. What exhibitions, if any, were on the grounds prior to April 2nd and for what length of time?

"A. I had Smith's Carnival from March 28th to April 2nd, inclusive.

"Q. Were there any amusements of any kind on the property from March 7th to March 28th?

"A. No.

"Q. Have there been any amusements on the park since April 16th?

"A. No.

"Q. How long have you been using the property for staging public amusements?

"A. As I have stated already about fifteen years, probably longer.

"Q. Have you been running the property during that time in the same manner in which it was operated during the present year?

"A. So far as physical features are concerned, yes, but only in the past year, beginning March 7th, have I had the State license as owner and operator of a permanent park for public amusement.

"Q. Under what license have you operated during the years preceding 1921?

"A. I have had no license in the past years." (The licenses for the past years had always been paid by the proprietors of the shows.)

It is thus perfectly apparent that for the year 1921, in which Mr. Ficklen attempted to exhibit traveling shows and carnivals under the license for a permanent park, he made no substantial change in regard to the character of the entertainment given there, but in effect merely continued to operate a show ground under an arrangement whereby both he and the performers would escape taxation and thereby increase their revenue.   We agree with

the contention of the Commonwealth that the contract which was made between him and Clarke, viewed in the light of the surroundings, was a transparent cover for the real relationship between Ficklen and Clarke, which, in substance, was that Ficklen was the landlord and Clarke was the tenant.

It is not necessary to charge Mr. Ficklen with bad faith in making this arrangement. He is rather severely criticised in the brief of counsel for the Commonwealth, but he apparently believed that the new arrangement was a lawful device, and in this view he was sustained by the learned judge of the lower court. We are of opinion, however, that under the facts as disclosed by the evidence he was not operating a permanent park for public amusement within the contemplation of the statute. The fact that he had obtained a license for that purpose is, of course, immaterial if he was not conducting the place in a manner authorized by the license. The license did not, in our opinion, authorize the exhibition which Clarke gave on the lot. Inasmuch as he and Ficklen were working together to a common end and under a contract whereby they were to share any additional taxes in proportions agreed upon between them, it was not very material as a matter of natural right and justice whether the license was assessed against one or the other, or both. At any rate, and as a matter of fact, it was assessed against and paid by Clarke, who was the actual exhibitor, and the sole defense made before us against the payment of the license is that it was not payable by either Ficklen or Clarke because it was covered by the license already held by the former. Our view is to the contrary, and the judgment complained of will be reversed and final order entered here denying the relief sought.

*Reversed.*